TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-03-00169-CV






Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg
Abbott, successor to John Cornyn, Attorney General of the State of Texas, Appellants


v.


Lexington Insurance Company, Landmark Insurance Company, and American
International Specialty Lines Insurance Company, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. GN100569, HONORABLE CHARLES F. CAMPBELL, JUDGE PRESIDING





O P I N I O N




 This case concerns a dispute between the Comptroller of Texas (1) and three surplus
lines insurance companies--Lexington Insurance Company, Landmark Insurance Company, and
American International Specialty Lines Insurance Company (collectively, the Insurers (2))--over the
Comptroller's assessment of premium taxes on certain of their issued policies. The Insurers contend
that the unauthorized insurance premium tax does not apply to eligible surplus lines insurers. The
Comptroller asserts that although eligible to issue surplus insurance in Texas, the Insurers were
required to issue the policies through licensed Texas surplus lines agents; otherwise, they conducted
unlawful and unauthorized insurance and were subject to the tax. Because the Insurers have not
produced evidence that the policies were issued through licensed agents, argues the Comptroller,
they are liable for the tax. After unsuccessfully pursuing lengthy redetermination proceedings with
the Comptroller, the Insurers paid their respective taxes under protest and sought a refund in district
court. The district court granted the Insurers' summary-judgment motion and ordered the
Comptroller to refund the taxes, declaring that Former Article 1.14-1, § 11(a) (3) does not apply to
eligible surplus lines insurers. Because we hold that surplus lines policies must be issued through
licensed Texas agents or be independently procured to avoid the tax under article 1.14-1, §11(a), we
reverse the judgment of the trial court and remand this cause for further proceedings consistent with
this opinion.


BACKGROUND


 Surplus lines insurance allows a person who seeks to insure a Texas risk but is unable
to obtain that insurance from a Texas-licensed insurer to seek the insurance from an insurer who is
not licensed in Texas but is an "eligible" surplus lines insurer. See Tex. Ins. Code Ann. § 981.001
(West Supp. 2003). An insurer is an "eligible" surplus lines insurer if it meets certain minimum
capital and surplus requirements outlined in the insurance code. (4) See Tex. Ins. Code Ann.
§§ 981.002(1), .057 (West Supp. 2003). (5) The Insurers here are not licensed in Texas but are
"eligible" to issue surplus lines insurance in the state.

 The Comptroller audited the Insurers for the years 1992 to 1995, found a tax
deficiency, and imposed unauthorized insurance premium taxes--$362,975.97 against American
International Specialty Lines Insurance Company (American International), $6,956,251.08 against
Lexington, and $151,599.99 against Landmark. (6) The insurance policies for which the taxes were
assessed insured Texas risks on subjects either resident, located, or to be performed in Texas. To
conduct its audit and deficiency determination, the Comptroller used records obtained from the
surplus lines stamping office, which is created under the authority of the insurance code to review
and record surplus lines insurance contracts placed by licensed Texas surplus lines agents and to
assist the Commissioner of Insurance in evaluating the eligibility of surplus lines insurers. See id.
§§ 981.151, .154, .158 (West Supp. 2003). Texas-licensed surplus lines agents must file a copy of
every policy placed through them with the stamping office within sixty days of a policy's effective
or issue date. See id. § 981.105 (West Supp. 2003). The policies for which the Comptroller assessed
the taxes were not reported to the surplus lines stamping office by licensed Texas surplus lines
agents.


Procedural history

 The tax code allows a person who has a direct interest in a tax-deficiency
determination to petition the Comptroller for a redetermination. See Tex. Tax Code Ann. § 111.009
(West 2001). About a year after the Comptroller initially assessed the deficiency against American
International, the Comptroller reduced American International's liability because it provided
evidence that taxes had been paid on some of the policies at issue. With respect to the remaining
assessed deficiency, American International timely requested a redetermination, claiming that
Former Article 1.14-1, section 11 did not apply to it as an eligible surplus lines insurer. The
Administrative Hearings Section of the Comptroller's office held a hearing in 1998 or early 1999
on American International's request. The Tax Division of the Comptroller's office represented the
Comptroller. In June 1999, the administrative law judge (ALJ) recommended that the audit
assessment be affirmed, and the Comptroller accepted this recommendation in an order. American
International timely paid its tax under protest on June 21, 1999, indicating this intent in a letter
submitted with the payment that reiterated the legal arguments it had been alleging over the course
of the redetermination proceedings. The Tax Division agreed to American International's motion
for rehearing, to allow the insurer an opportunity to produce records evidencing payment of the tax
or use of licensed agents. After another hearing, the ALJ issued a recommendation in May 2000 to
affirm the audit assessment, as reduced by agreement between American International and the Tax
Division, which the Comptroller incorporated into an order. On June 8, 2000, American
International filed another motion for rehearing. The ALJ recommended denial of the motion, and
the Comptroller accepted this recommendation in an order in August 2000. American International
filed a suit for judicial review in September 2000 seeking a declaratory judgment, an injunction, and
refund of the taxes it paid under protest.

 In December 1997, Lexington and Landmark filed a timely redetermination request
upon receiving their deficiency assessments. They contended that the Comptroller had no
jurisdiction to label them unauthorized insurers in order to assess the unauthorized premium tax;
only the Department of Insurance could declare them unauthorized. Lexington and Landmark's
proceedings were consolidated, and a hearing was conducted in September 1998. The
Administrative Hearings Section conducted redetermination hearings and undertook extensive
information-gathering from Lexington and Landmark and the stamping office, attempting to
determine whether any of the policies at issue had been placed through licensed Texas agents or
independently procured. See Former Article 1.14-1, § 11(a). In June 1999, the ALJ recommended
that the audit assessments as to Lexington and Landmark be affirmed, with a reduction in the tax due
from Lexington based on records it had produced. The Comptroller signed the ALJ's decision. The
Tax Division and Lexington and Landmark then filed an agreed motion for rehearing to allow the
insurers further opportunity to prove that additional policies had been issued through licensed agents. 
The insurers conducted extensive research of their records, contacting various brokers to obtain any
relevant records on the policies at issue. After another hearing, the ALJ issued a recommendation
in November 2000 that, with certain agreed reductions in the amounts owed, the taxes assessed
against Lexington and Landmark be affirmed. The Comptroller signed an order accepting these
recommendations, which required the payment of the taxes within twenty days. Lexington and
Landmark timely paid the taxes under protest on November 22, 2000, accompanying their payment
with a letter stating that the payment was made under protest, indicating that a motion for rehearing
would be timely filed, and outlining the reasons why the taxes were not due. On the same day,
Lexington and Landmark filed a motion for rehearing, asking the Comptroller to refund the taxes
paid under protest and reiterating their arguments developed throughout the redetermination
proceedings. After reviewing the issue over the next few months, the Comptroller denied this
motion for rehearing in February 2001. On February 22, 2001, Lexington and Landmark filed their
suit for judicial review seeking declaratory judgment, an injunction, and a refund of the taxes paid
under protest.

 In June 2001, the three Insurers filed a motion to consolidate their individual suits,
which the trial court granted. Subsequently, the Insurers filed a motion for summary judgment,
arguing that article 1.14-1, section 11(a) did not apply to eligible surplus lines insurers, and thus they
were entitled to a refund of the taxes paid under protest. The trial court granted summary judgment
for the Insurers, ordering the Comptroller to refund the taxes. The Comptroller brings this appeal,
asserting that (1) the trial court did not have jurisdiction over the refund suits because the Insurers
did not exhaust administrative remedies, (2) the trial court did not have jurisdiction to render
declaratory judgment because such action cannot stand on its own in the absence of a refund suit,
and (3) the Insurers are liable for the unauthorized insurance premium tax because they failed to
comply with statutory requirements to lawfully conduct surplus lines insurance.


DISCUSSION


Exhaustion of administrative remedies

 The Comptroller contends that the Insurers failed to exhaust administrative remedies
before filing their refund suits, depriving the trial court of jurisdiction to consider their refund
requests. See Subaru of Am., Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212, 221 (Tex. 2002)
(court has no jurisdiction if plaintiff fails to exhaust administrative remedies); Hill v. Board of
Trustees, 40 S.W.3d 676, 679 (Tex. App.--Austin 2001, no pet.) (same). The Insurers filed their
lawsuits under section 112.151 of the tax code, pertaining to refund suits. See Tex. Tax Code Ann.
§ 112.151 (West 2001). Although the Insurers paid their respective taxes under protest with
accompanying protest letters, the Comptroller asserts that the Insurers' protest letters cannot be
construed as the "refund claims" required under sections 111.104 and 112.151 of the tax code. See
Burgess v. Gallery Model Homes, Inc., 101 S.W.3d 550, 558 (Tex. App.--Houston [1st Dist.] 2003,
pet. denied) (Comptroller has exclusive jurisdiction to resolve tax refunds, and party must exhaust
such remedy before filing refund suit under tax code section 112.151); Bullock v. Marathon Oil Co.,
798 S.W.2d 353, 360-61 (Tex. App.--Austin 1990, no writ) (to maintain action against Comptroller
for tax refund, party must meet requirements of tax-protest law). The Comptroller notes that
although the protest letters and payments set the stage for a protest suit under section 112.052 of the
tax code, the Insurers failed to file such suit within ninety days of making their protest payments,
foreclosing that avenue of relief. See Tex. Tax Code Ann. § 112.052(b). Thus, concludes the
Comptroller, the Insurers did not comply with the mandatory and exclusive administrative remedies
required under the tax code, and the district court did not have jurisdiction over these causes.

 The Insurers rejoin that their protest-payment letters were, in substance, refund
claims, although they did not use the magic word "refund." Additionally, they filed motions for
rehearing, and these motions were denied by the Comptroller, also administrative requirements. See
id. § 112.151. Finally, they filed suit within thirty days from when the Comptroller denied their final
motions for rehearing. See id. Thus, they contend that they exhausted their administrative remedies,
and the trial court properly assumed jurisdiction of their suits. To resolve this dispute, we turn first
to the protest letters themselves.

 American International's letter submitted with its protest payment reads, in pertinent
part:


Dear Comptroller Rylander:


On behalf of the above-captioned eligible surplus lines insurance company, we
hereby hand you a check in the amount of $362,975.97 . . . . This payment is made
under protest for the following reasons which will be stated more fully in the motion
for rehearing which will be timely filed: [American International is not subject to
taxation under article 1.14-1, § 11(a); Comptroller has no jurisdiction to assess the
tax; disputed tax has been paid already by licensed surplus lines agents; Comptroller
has usurped authority of Commissioner of Insurance in declaring American
International unauthorized; tax statute is to be construed against agency; Comptroller
did not meet burden of proof to declare American International unauthorized; and
American International was deprived fair hearing when Comptroller treated a prior
decision on a similar topic as determinative of this dispute].



Lexington and Landmark's joint protest letter reads substantially the same, although outlining their
reasons in more detail. On the face of the protest letters, therefore, the Comptroller is correct that
the Insurers did not explicitly ask for a "refund." (7) Thus, we consider whether their protest letters can
reasonably be construed as "refund claims" under sections 111.104 and 112.151 of the tax code. (8)

 It is difficult to conclude that the Insurers' protest letters alone could reasonably be
construed as "refund claims" because they do not ask for a refund or in any other language seek the
return of their money paid under protest. It is their respective motions for rehearing that ask for a
refund. The statute is clear: a refund claim must be written, state the grounds on which the claim
is founded, and be filed before the expiration of the applicable limitation period. See Tex. Tax Code
Ann. § 111.104. The statute does not explicitly require that the word "refund" be used in a refund
claim, but the desire for a refund must be apparent. Although the written letters were timely and
stated the grounds on which the protest is lodged, the Insurers do not ask for their money back. The
letters, as written, lay the ground for a protest suit under sections 112.051 and 112.052 of the tax
code (requiring only that protest be in writing and state reasons for recovery of payment, and that suit
be filed within 90 days).

 When taxes are disputed, the tax code provides two distinct types of suits, with
different procedural requirements: protest suits and refund suits. Compare id. § 112.051, .052
(authorizing protest suits), with id. § 112.151 (authorizing refund suits). Although intuitively it
seems that when a taxpayer pays a tax "under protest," that person contends that she does not owe
the tax and thus wants her money back, the legislature has clearly indicated that a tax-refund claim
and the corresponding procedures outlined in section 112.051 are an exclusive remedy for a tax-refund suit, which is distinct procedurally from a protest suit. (9) On the evidence of the protest letters
alone, we would conclude that the Insurers had not filed "refund claims" and had, therefore, failed
to exhaust their administrative remedies. (10)

 However, we must analyze the protest letters in the context of the particular
proceedings pending between the Insurers and the Comptroller. Since the Insurers requested a
redetermination of the tax assessed in late 1997, the Comptroller has been aware of their basic legal
argument that they owe no tax whatsoever. By the time the Insurers had filed their respective protest
letters, they and the Comptroller had been embroiled in conflict over the proper interpretation of
Former Article 1.14-1, section 11(a) of the insurance code and the Insurers' liability, if any, for the
unauthorized insurance premium tax. The Insurers had long asserted their legal arguments that they
were authorized, not unauthorized, insurers. The Comptroller had iterated her opposing
interpretation of the statute. Hearings had been conducted in compliance with the Insurers' requests
for redetermination of the tax assessments. Negotiations had occurred between the Insurers and the
Comptroller, resulting in agreed motions for rehearing and reductions in the amounts owed due to
records the Insurers were able to produce. Both the Comptroller and the Insurers were on fair notice
of the opposing side's position. The Insurers' final motions for rehearing (in June 2000 for
American International and in June 1999 for Lexington and Landmark) merely reiterated their
contention that they owed no taxes at all, for all the reasons they had been urging throughout the
redetermination process.

 The policy behind the exhaustion-of-administrative-remedies doctrine is to allow the
agency to resolve disputed issues of fact and policy and to assure that the appropriate body
adjudicates the dispute. Essenburg v. Dallas County, 988 S.W.2d 188, 189 (Tex. 1998). Similarly,
the policy seeks to encourage parties to resolve their dispute without resorting to litigation when an
administrative procedure is provided for that purpose. See Vela v. Waco Indep. Sch. Dist., 69
S.W.3d 695, 702 (Tex. App.--Waco 2002, pet. withdrawn). Also, there are several long-recognized
exceptions to the doctrine: (1) where an injunction is sought and irreparable harm would result; (2)
where the administrative agency cannot grant the requested relief; (3) when the issue presented is
purely a question of law; (4) where certain constitutional issues are involved; and (5) where an
administrative agency purports to act outside its statutory powers. Gibson v. Waco Indep. Sch. Dist.,
971 S.W.2d 199, 201-02 (Tex. App.--Waco 1998), vacated on other grounds, 22 S.W.3d 849 (Tex.
2000); see Larry Koch, Inc. v. Texas Natural Res. Conservation Comm'n, 52 S.W.3d 833, 839-40
(Tex. App.--Austin 2001, pet. denied). In the case of an agency allegedly acting outside of its
statutory powers, the "purposes underlying the exhaustion rule are not applicable: judicial and
administrative efficiency are not served, and agency policies and expertise are irrelevant, if the
agency's final action will be a nullity." Larry Koch, 52 S.W.3d at 840. Here, the Insurers insisted
that the Comptroller had no authority to declare them unauthorized insurers because such authority
rested exclusively with the Commissioner of Insurance. If the Insurers were to prevail on their
theory that the Comptroller was acting outside her authority in assessing these taxes against an
eligible surplus lines insurer, the administrative requirements for a refund in the tax code would be
mere formalities, as the Comptroller's actions in assessing the taxes would ultimately be "nullities." 
See id. at 840.

 Although the Insurers were seeking more than declaratory relief, the policy behind
the exhaustion doctrine is not served by denying the Insurers their day in court after the detailed and
lengthy process that had occurred here. To the contrary, the policy--at this stage in the
proceedings--would be better served if a court resolved the issue because a court is the more
"appropriate body" to adjudicate the fundamental question of law at issue here: the meaning of
Former Article 1.14-1, section 11. See Essenburg, 988 S.W.2d at 189. We conclude that under these
particular facts, it would have "served no purpose" for the Insurers to file technically correct refund
claims and proceed through duplicative hearings when the Comptroller was on notice of the legal
bases for their claims.

 The Insurers cite our opinion in Sharp v. International Business Machines Corp. for
the proposition that courts ought not strictly apply procedural requirements under certain
circumstances when to do so would be an exercise in futility, while relaxation of the requirements
would "achieve judicial efficiency and prevent unnecessary waste of judicial resources." 927 S.W.2d
790, 795 (Tex. App.--Austin 1996, writ denied); see also Estepp v. Miller, 731 S.W.2d 677, 680
(Tex. App.--Austin 1987, writ ref'd n.r.e.). In International Business Machines, IBM filed an initial
refund request with the Comptroller, which the Comptroller denied because it was filed after the
four-year limitations period had expired. International Bus. Machs., 927 S.W.2d at 791. IBM filed
a motion for rehearing, which the Comptroller denied. Then, IBM filed a second refund request for
the same tax year, seeking an amount in addition to that sought in the first request. Before the
Comptroller took any action on this second request, IBM filed suit in district court contesting the
Comptroller's denial of the first request and seeking a refund in an amount totaling the first and
second requests. Id. IBM concurrently requested a hearing on its second request, which was denied,
but never filed a motion for rehearing on this request, as required by the tax code. Id. at 792; see
Tex. Tax Code Ann. § 112.151. In the lawsuit, the Comptroller asserted that the court had no
jurisdiction over the second refund claim because no motion for rehearing had been filed. 
International Bus. Machs., 927 S.W.2d at 795. This Court held that, nevertheless, it had jurisdiction
over both refund claims because the determination as to whether IBM's second request was timely
filed depended completely on whether its first request was filed within the limitations period. Id. 
"It would have served no purpose for IBM to obtain a hearing on its Second Request . . . when its
First Request, filed over two years before, was denied because it was not timely filed." International
Bus. Machs., 927 S.W.2d at 795.

 The IBM case is distinguishable because IBM already had some basis for a valid
lawsuit as to its first refund claim. The Insurers here could not have sued the Comptroller for any
refund if we applied the strictly technical requirement of a refund claim. Nevertheless, the policy
behind relaxing administrative requirements if their strict application would produce "an exercise
in futility," see id., 927 S.W.2d at 795, applies here.

 We conclude that under the facts of this case, the Insurers have substantially met the
requirements of section 112.151. The Comptroller had studied the issue of the applicability of article
1.14-1, section 11(a) to these insurers closely, and had consistently resolved that legal question
against them. The parties had attempted to resolve their dispute through the administrative process. 
Finally, the Insurers determined that a lawsuit was necessary to determine the statute's applicability. 
Because the Insurers rely on a strictly legal argument that they could not be taxed under the statute
authorizing taxes on unauthorized insurance premiums, and in light of the protracted administrative
process already completed, their payment under protest could not reasonably be regarded as anything
but a request for a refund. Indeed, their motions for rehearing made this claim explicit. After the
Comptroller denied the motions for rehearing, the Insurers filed their lawsuits. Under these
particular facts, we hold that the Insurers sufficiently exhausted their administrative remedies by
filing "refund claims" with the Comptroller and pursuing the additional requirements under the tax
code. We overrule the Comptroller's first issue.


Declaratory judgment

 In its second issue, the Comptroller asserts that the trial court also lacked jurisdiction
over the Insurers' declaratory-judgment claim, because that claim cannot stand on its own. To
support this argument, it cites State v. Morales, which declared that the Uniform Declaratory
Judgments Act is "merely a procedural device for deciding cases already within a court's
jurisdiction" and that "[a] litigant's request for declaratory relief cannot confer jurisdiction on the
court, nor can it change the basic character of a suit." 869 S.W.2d 941, 947 (Tex. 1994); see Tex.
Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2004). However, our holding
that the Insurers exhausted their administrative remedies before filing their suit confers jurisdiction
on the district court. Thus, the declaratory-judgment action need not stand on its own, but in
conjunction with the Insurers' refund suit. We overrule the Comptroller's second issue.


Unauthorized insurance premium tax

 The trial court declared that the unauthorized insurance premium tax outlined in
Former Article 1.14-1, section 11(a) does not apply to eligible surplus lines insurers. See Former
Article 1.14-1, § 11(a). (11) The Comptroller asserts that although a surplus lines insurer may be
"eligible," that status does not necessarily prevent such insurer from acting in an "unauthorized"
manner that then subjects it to the premium-receipts tax. When the Insurers failed to use licensed
Texas surplus lines agents, their issuance of the subject policies was unauthorized and made them
liable for the tax. We begin our discussion with the text of Former Article 1.14-1, section 11(a), the
statute that was in effect during the applicable time period.

 Former Article 1.14-1 is entitled "Unauthorized Insurance." Its purpose is to afford
the Board of Insurance and the courts of Texas personal jurisdiction over an out-of-state insurer
doing business in Texas without a certificate of authority from the Board. Risk Managers Int'l, Inc.
v. State, 858 S.W.2d 567, 571 (Tex. App.--Austin 1993, writ denied); Act of May 27, 1993, 73d
Leg., R.S., ch. 999, § 1, 1993 Tex. Gen. Laws 4373, 4373, repealed by Act of Apr. 30, 1999, 76th
Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538. (12) Before 1993, section 11 of the article
required unauthorized insurers to pay to the Board of Insurance a premium-receipts tax: "[e]xcept
as to premiums on lawfully procured surplus lines insurance and premiums on independently
procured insurance on which a tax has been paid pursuant to this Article or Article 1.14-2, every
unauthorized insurer shall pay . . . a premium receipts tax of 4.85 percent of gross premiums
charged." Former Article 1.14-1, § 11(a) (emphasis added). (13)

 Notably, the liability for the premium-receipts tax hinges on whether an insurer is
"unauthorized." The statute excepts those premiums received on a lawfully procured surplus lines
insurance policy or on an independently procured insurance, if a premium tax has been paid. 
Unauthorized insurers who receive the excepted premiums on which a tax has been paid are not
liable for the premium-receipts tax imposed by section 11. Under this statutory scheme, we must
engage in a two-step analysis to determine whether the eligible Insurers can ever be considered
"unauthorized" and if so, whether they qualify for either of the exceptions.

 To determine whether the Insurers may be considered unauthorized, we turn first to
section 2 of Former Article 1.14-1, which broadly defines acts that may constitute doing insurance
business in Texas. They include the making of an insurance contract, the receiving of any premium,
the issuance of a contract of insurance to a Texas resident, and "any other transaction of business in
this state by an insurer." See Act of May 29, 1993, 73d Leg., R.S., ch. 685, § 3.031, 1993 Tex. Gen.
Laws 2559, 2577, repealed by Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen.
Laws 486, 538. The definition of "insurance business," therefore, is global, encompassing every
conceivable form of business conducted by an insurer. Subsection (b) of section 2 then exempts
certain transactions from the umbrella definition of "insurance business." The "lawful transaction
of surplus lines insurance" and "independently procured insurance" are exempted. See Act of Dec.
12, 1989, 71st Leg., 2d C.S., ch. 1, § 13.11(b), 1990 Tex. Gen. Laws 1, 96, amended by Act of May
29, 1993, 73d Leg., R.S., ch. 685, § 3.03, 1993 Tex. Gen. Laws 2559, 2576, repealed by Act of Apr.
30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538 ("The provisions of this
section do not apply to: (1) The lawful transaction of surplus lines insurance . . . [and] (4)
Transactions involving contracts of insurance procured through negotiations occurring entirely
outside of this state which are reported and on which a premium tax is paid in accordance with this
Article.") (hereinafter cited as Former Article 1.14-1, § 2(b)). Section 3 explains what makes a
transaction an act of unauthorized insurance: "[n]o person or insurer shall directly or indirectly do
any of the acts of an insurance business set forth in this Article except as provided by and in
accordance with the specific authorization of statute." See Act of May 27, 1985, 69th Leg., R.S.,
ch. 918, § 2, 1985 Tex. Gen. Laws 3088, 3089, repealed by Act of Apr. 30, 1999, 76th Leg., R.S.,
ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538 (emphasis added). In other words, an insurer has
conducted the unauthorized business of insurance when it engages in any of the listed transactions
(collecting premiums) in a manner that is not specifically authorized by statute. Furthermore, it is
the engaging in such a transaction that makes an insurer "unauthorized." Thus, we must determine
in what manner a surplus lines insurer is authorized to conduct insurance business in Texas. For this,
we turn to Former Article 1.14-2.

 The purpose of Former Article 1.14-2, entitled "Surplus Lines Insurance," is to
"provide for the regulation, taxation, supervision and control" of insurance transactions that are
"entered into by citizens of this state with unauthorized (14) insurers through a surplus lines agent as
a result of difficulty in obtaining coverage from licensed insurers." Act of Apr. 27, 1967, 60th Leg.,
R.S., ch. 185, § 2, 1967 Tex. Gen. Laws 400, 408, amended by Act of May 27, 1993, 73d Leg., R.S.,
ch. 999, § 8, 1993 Tex. Gen. Laws 4373, 4376, repealed by Act of May 22, 2001, 77th Leg., R.S.,
ch. 1419, § 31(b)(1), 2001 Tex. Gen. Laws 3658, 4208 (emphasis added). This reveals a clear
legislative intent that surplus lines insurance be obtained through a licensed Texas agent:


In order to properly regulate and tax such . . . insurance . . . the Legislature herein
provides an orderly method for the insuring public of this state to effect insurance
with unauthorized insurers through qualified, licensed and supervised surplus lines
agents in this state . . . so that such insurance coverage may be obtained by residents
of this state . . . to the extent that the coverage is not procurable from duly licensed,
regulated insurers conducting business in this state.


Id. (emphasis added). Section 3 of the article provides authorization for surplus lines insurers,
"subject to the following conditions: . . . The insurer must be an eligible surplus lines insurer . . .
[and] [t]he insurance must be placed through a licensed Texas surplus lines agent resident in this
state." See Act of May 27, 1993, 73d Leg., R.S., ch. 999, § 10, 1993 Tex. Gen. Laws 4373, 4377,
repealed by Act of May 22, 2001, 77th Leg., R.S., ch. 1419, § 31(b)(1), 2001 Tex. Gen. Laws 3658,
4208. If surplus lines insurance is not placed through a licensed Texas surplus lines agent, the
transaction does not qualify as the "the lawful transaction of surplus lines insurance." See Former
Article 1.14-1, § 2(b) (emphasis added). Indeed, the transaction cannot meet the definition of
"lawfully procured surplus lines insurance" in section 11 of Former Article 1.14-1. See Former
Article 1.14-1, § 11(a) (emphasis added).

 Both the Insurers and the Comptroller rely on isolated phrases from the Mid-American
Indem. Ins. Co. v. King decision to support their opposing positions on appeal. 22 S.W.3d 321 (Tex.
1995). We hold that the King decision, determining that a carrier lost its status as an eligible surplus
lines carrier after the legislature increased the capital and surplus requirements for eligibility, does
not resolve the issue presented here: Whether the status of being an eligible surplus lines insurer
prevents such insurer from acting in an unauthorized manner that subjects it to the premium receipts
tax. (15)

 We conclude that surplus lines insurers who do not place surplus lines insurance
through a licensed Texas surplus lines agent are not lawfully transacting surplus lines insurance. 
Such insurers have engaged in unauthorized insurance and become "unauthorized insurers" liable
for the premium tax imposed by Former Article 1.14-1, section 11. Only an insurer who receives
premiums on independently procured insurance on which a premium-receipts tax has been paid is
excepted from this liability. We conclude that surplus lines insurers--eligible or not--are liable for
the unauthorized insurance premium tax imposed by Article 1.14-1 if they have not placed the
insurance through a licensed Texas surplus lines agent or if the insurance has not been independently
procured.

 Citing Texas Unemployment Comp. Comm'n v. Bass, 151 S.W.2d 567, 570 (Tex.
1941), the Insurers contend that the statute must be construed against the taxing authority. We
disagree. The Insurers are actually seeking an exemption from the tax on unauthorized insurance
premiums. To conduct the authorized business of insurance as an insurer not licensed in this state,
the Insurers must comply with the statutory requirements. When a taxpayer claims an exemption,
the court is to strictly construe the exemption provision against the taxpayer. Bullock v. National
Bancshares Corp., 584 S.W.2d 268, 272 (Tex. 1979). Moreover, "a person or entity claiming the
benefit of a statutory exemption has the burden of proving every fact essential to the invocation of
the exemption." Risk Managers, 858 S.W.2d at 570 (citing Cramer v. Shepard, 167 S.W.2d 147
(Tex. 1942)). To prevail, the Insurers must be able to prove that they fell under one of the
exemptions to the unauthorized insurance premium tax: that the premiums they collected were for
(1) lawfully procured surplus lines insurance on which a tax had been paid or (2) independently
procured insurance on which a tax had been paid. (16) They failed to meet this burden. We sustain the
third issue and hold that the district court erred in declaring that eligible surplus lines insurers are
not subject to Former Article 1.14-1.


CONCLUSION


 The Insurers substantially exhausted their administrative remedies before filing suit
in district court, and therefore the trial court had jurisdiction over their refund suit and their related
claims. Because the trial court erred in interpreting Former Article 1.14-1 of the insurance code, we
reverse its grant of summary judgment in favor of the Insurers and remand this cause for further
proceedings not inconsistent with this opinion.



 

 Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Reversed and Remanded

Filed: February 20, 2004
1. The Attorney General of the State of Texas, Greg Abbott, is also an appellant in this case. 
Because the interests of the Attorney General and of the Comptroller coincide, we will refer to
appellants collectively as "the Comptroller."
2. When the Insurers' interests diverge, we will refer to them individually.
3. Although the district court's order refers to the current statute, section 101.251 of the
insurance code, we will refer to Former Article 1.14-1, § 11(a), in effect at the time of this dispute. 
See Act of May 22, 1989, 71st Leg., R.S., ch. 242, § 1, 1989 Tex. Gen. Laws 1151, 1151, amended
by Act of May 27, 1993, 73d Leg., R.S., ch. 999, § 6, 1993 Tex. Gen. Laws 4373, 4375, repealed
by Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538 (hereinafter
cited as Former Article 1.14-1, § 11(a)).
4. There is no dispute that the Insurers are "eligible" surplus lines insurers, as defined under
the insurance code: "An eligible surplus lines insurer must maintain capital and surplus in an
amount of at least $15 million [or] [i]f an eligible surplus lines insurer is an insurance exchange
created by the laws of another state . . . [it must meet certain detailed capital and surplus
requirements]." See Tex. Ins. Code Ann. § 981.057 (West Supp. 2003).
5. The Texas Insurance Code has undergone recodification in recent years. For the sake of
convenience, when a cited provision has not substantially changed from that in effect during the time
relevant to this dispute, citation will be to the current insurance code.
6. The amounts assessed have fluctuated over the course of the proceedings due to agreed
reductions, proof the Insurers have presented, and interest.
7. The Insurers, in their respective final motions for rehearing filed on June 8, 2000, for
American International and on November 22, 2000, for Lexington and Landmark, did ask the
Comptroller for a refund of the taxes paid under protest.
8. Section 111.104 provides in relevant part:


(b) A tax refund claim may be filed with the comptroller by the person who paid
the tax or by the person's attorney, assignee, or other successor.


(c) A claim for refund must:


 (1) be written;


 (2) state the grounds on which the claim is founded; and


 (3) be filed before the expiration of the applicable limitation period . . . .


Tex. Tax Code Ann. § 111.104 (West 2001).


Section 112.151 provides in relevant part:


(a) A person may sue the comptroller to recover an amount of tax, penalty, or
interest that has been the subject of a tax refund claim if the person has:


 (1) filed a tax refund claim under Section 111.104 of this code;


 (2) filed, as provided by Section 111.105 of this code, a motion for
rehearing that has been denied by the comptroller; and


 (3) paid any additional tax found due in a jeopardy or deficiency
determination that applies to the tax liability period covered in the tax
refund claim.

(b) The suit must be brought against both the comptroller and the attorney
general and must be filed in a district court.


(c) The suit must be filed before the expiration of 30 days after the issue date
of the denial of the motion for rehearing or it is barred.


Id. § 112.151 (West 2003).
9. It seems incongruous that for a protest suit, a taxpayer need not specifically ask for a
refund in the protest letter, although a taxpayer's hoped-for result under either a tax-refund or
protest-payment proceeding is the same: recovery of taxes already paid. Compare Tex. Tax Code
Ann. §§ 112.051, .052 (West 2001), with id. § 112.151 (West 2001). The tax code gives little
guidance as to whether a claim more appropriately qualifies as a refund or a protest suit. However,
the purpose behind protest suits is to provide an adequate legal remedy whereby a taxpayer may test
the validity of a tax without having to resort to the traditional equitable remedy of injunction, which
would restrain the state's collection of the tax and disrupt the tax-collection process. Cobb v.
Harrington, 190 S.W.2d 709, 713 (Tex. 1945); Bernard Hanyard Enters., Inc. v. McBeath, 663
S.W.2d 639, 643 (Tex. App.--Austin 1983, writ ref'd n.r.e.). A refund suit, on the other hand,
serves the purpose of empowering the Comptroller, upon her determination, to refund the payment
of certain taxes found to have been paid through mistake of fact or law, thereby relieving the
legislature of time-consuming claims made directly to lawmakers. See Motorola, Inc. v. Bullock,
586 S.W.2d 706, 708-710 (Tex. Civ. App.--Austin 1979, no writ). It would appear from the
purposes behind these two tracks, therefore, that the Insurers' claims fell more appropriately under
the protest-track. However, if they have adequately exhausted the administrative remedies under the
refund-track, there is nothing in the tax code that prevents the Insurers from bringing this suit as a
refund suit.
10. In this vein, at least Lexington and Landmark had also not completely fulfilled the
requirement in sections 111.105 and 112.051 pertaining to motions for rehearing. Section 112.051
requires that a claimant have filed a motion for rehearing pursuant to section 111.105. That section,
in turn, implies that to file a motion for rehearing, a claimant must have first requested a hearing, had
the hearing, and then filed a motion for rehearing: 


A person claiming a refund under section 111.104 . . . is entitled to a hearing
on the claim if the person requests a hearing . . . . A decision of the comptroller
following a hearing on a claim for refund becomes final 20 days after service
on the claimant of the notice of the order or decision. A tax refund claimant
who is dissatisfied with the decision on the claim is entitled to file a motion for
rehearing.


Tex. Tax Code Ann. § 111.105 (West 2001). The protest letter and motion for rehearing on which
Lexington and Landmark rely were filed on the same day, and there is no indication in the record that
the requisite hearing request and actual hearing occurred.
11. Former Article 1.14-1, section 11(a) provided in relevant part:


Except as to premiums on lawfully procured surplus lines insurance and
premiums on independently procured insurance on which a tax has been paid
pursuant to this Article or Article 1.14-2, every unauthorized insurer shall pay
to the State Board of Insurance before March 1 next succeeding the calendar
year in which the insurance was so effectuated, continued or renewed a
premium receipts tax of 4.85 percent of gross premiums charged for such
insurance on subjects resident, located or to be performed in this state.


Former Article 1.14-1, § 11(a). This article was amended, effective September 1993, to read:

Except as to premiums on insurance procured by a licensed surplus lines agent
from an eligible surplus lines insurer as defined in Article 1.14-2 and premiums
on independently procured insurance on which a tax has been paid pursuant to
this Article or Article 1.14-2, every unauthorized insurer shall pay to the
comptroller, on a form prescribed by the comptroller, before March 1 next
succeeding the calendar year in which the insurance was so effectuated,
continued or renewed or another date prescribed by the comptroller a premium
receipts tax of 4.85 percent of gross premiums charged for such insurance on
subjects resident, located or to be performed in this state.


Act of May 27, 1993, 73d Leg., R.S., ch. 999, § 6, 1993 Tex. Gen. Laws 4373, 4375, amended by
Act of May 29, 1993, 73d Leg., R.S., ch. 685, § 3.03, 1993 Tex. Gen. Laws 2559, 2575, repealed
by Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538.
12. Article 1.14-1, section 1 provided in relevant part: 


The purpose of this Article is to subject certain persons and insurers to the
jurisdiction of the State Board of Insurance . . . and of the courts of this state
. . . . The Legislature declares that it is a subject of concern that many residents
of this state hold policies of insurance issued by persons and insurers neither
authorized to do insurance business in this state nor qualified as eligible surplus
lines insurers as defined in Article 1.14-2 . . . . The Legislature declares that
it is also concerned with the protection of residents of this state against acts by
persons and insurers not authorized to do an insurance business in this state by
the maintenance of fair and honest insurance markets, by protecting the
premium tax revenues of this state, by protecting authorized persons and
insurers . . . from unfair competition by unauthorized persons and insurers and
by protecting against the evasion of the insurance regulation laws of this state.


Act of May 27, 1993, 73d Leg., R.S., ch. 999, § 1, 1993 Tex. Gen. Laws 4373, 4373, repealed by
Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538.
13. Former Article 1.14-1, section 11(a) was amended--effective September 1993--to require
unauthorized insurers to pay the tax to the comptroller rather than the State Board of Insurance. See
Act of May 29, 1993, 73d Leg., R.S., ch. 685, § 3.04, 1993 Tex. Gen. Laws 2559, 2578, repealed
by Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538.
14. The Insurers assert that a 1993 amendment to this article eliminated the term
"unauthorized" to describe surplus lines insurers and instead inserted the phrase "eligible surplus
lines insurers." See Act of May 27, 1993, 73d Leg., R.S., ch. 999, § 8, 1993 Tex. Gen. Laws 4373,
4376. This change, they urge, reveals a legislative intent to not treat eligible surplus lines insurers
as "unauthorized." This ignores, however, the clear language that was not changed in 1993 that
evidences an intent that surplus lines insurance be obtained through licensed surplus lines agents.
15. If anything, King cuts against the Insurers and in favor of the Comptroller, as the opinion
frames the sole issue there in terms of a section of the insurance code that imposes a bond
requirement on unauthorized insurers but excepts eligible surplus lines insurers from that
requirement. See Mid-American Indem. Ins. Co. v. King, 22 S.W.3d 321, 323 (Tex. 1995). There
would be no need to except eligible surplus lines insurers if they could not be unauthorized in the
first place. Indeed, in rejecting the dissent's argument that "[e]ligible surplus lines insurers are not
'unauthorized insurers,'" the majority concluded: "the general term 'unauthorized insurers' does
include eligible surplus lines insurers, because by definition such insurers are unlicensed." Id. at
326, 330 (emphasis added).
16. We recognize the Insurers' predicament that they have not maintained the necessary
records to enable them the benefit of the exemption because of the surplus lines insurance industry's
understanding of state premium-receipts tax law as imposing the tax burden on only the agent and
the Insurers' business practice to contractually place the burden of complying with a particular state's
laws on the brokers and agents. However, the Texas statutes are clear about what constitutes the
lawful practice of insurance in Texas, and it was the Insurers' burden to comply with Texas laws if
they desired to insure Texas risks.